**In re BRENDLE'S STORES, INC., Debtor.**

**FIRST UNION NATIONAL BANK OF NORTH CAROLINA, for Itself and as Agent for Nationsbank of North Carolina, N.A. and First Citizens Bank and Trust Company, Appellants,**

v.

**BRENDLE'S STORES, INC., Appellee.**

**No. 2:93CV00432.**

United States District Court, M.D. North Carolina, Greensboro Division.

Nov. 24, 1993.

NationsBank of North Carolina, N.A. and First Citizens Bank & Trust Company (Bank Group), filed a motion for relief from the automatic stay to set off pre-petition deposits and proceeds of Appellee's charge card sales of inventory.

As of the petition filing date, Appellee had credit card transactions in process from various credit card issuers generated from sales of Appellee's inventory which took place prior to the petition filing date in an amount of One Million Sixty-one Thousand Nine Hundred Twenty-eight and 83/100 .Dollars ($1,061,928.83). According to the terms of the *ex parte* order authorizing appellee to use pre-petition bank accounts with First Union and authorizing First Union as agent to freeze certain bank accounts (Depository Order), these funds were placed in a segregated interest bearing account. As of the petition date, none of the credit card transactions herein questioned had been forwarded to any member of the Bank Group for processing.

By virtue of the Depository Order and order granting emergency motion of debtor for authority under Bankruptcy Code §§ 105 and 365 to enter into amendment to credit card program agreement and to assume executory contract with Monogram Credit Card Bank of Georgia (Monogram Order), the bankruptcy court authorized the proceeds of Brendle's name brand charge card sales in the amount of Seven Hundred Sixty-one Thousand Two Hundred Thirteen and 10/100 Dollars ($761,213.10) to be transferred to the First Union National Bank's suspense account, subject to a reservation of rights by both Appellees and the Bank Group.

On or about March 17, 1993, the Bank Group filed its motion requesting relief from the automatic stay pursuant to §§ 362, 506, and 553 of the Bankruptcy Code to set off the suspense account consisting of pre-petition deposits and the proceeds of pre-petition charge card receipts, and interest earned thereon, and to apply such funds to the balance of the Bank Group's pre-petition debt. On March 30, 1993, Appellee filed its response to Bank Group's motion for relief from automatic stay in which Appellee requested that the bankruptcy court allow the Bank Group to set off the pre-petition depos-

Bell, Davis & Pitt by Walter W. Pitt, Jr., Winston–Salem, NC, and Petree Stockton by J. Michael Booe, Charlotte, NC, for appellants.

Allman, Spry, Humphreys, Leggett & Howington by R. Bradford Leggett, Winston–Salem, NC, for appellee.

### MEMORANDUM OPINION

ERWIN, Senior District Judge.

#### Procedural Posture

On November 22, 1992, Brendle's Stores, Inc. (Appellee) filed a voluntary petition under Chapter 11 of the Bankruptcy Code. After filing the petition, Appellee continued to operate its business and manage its property as debtor-in-possession. On or about March 17, 1993, First Union National Bank of North Carolina, for itself and as agent for

its and interest thereon but to prohibit the Bank Group from setting off the proceeds of the charge card receipts.

On May 25, 1993, the hearing on the motion for relief from the automatic stay was held before the bankruptcy court. On June 16, 1993, the bankruptcy court entered an order denying Bank Group's motion for relief from automatic stay on Charge Receivables. The matter presently before this Court is the Bank Group's appeal from the order denying relief.

## Facts

The Bank Group is the holder of a partially secured claim pursuant to an October 18, 1991 loan agreement, the loan documents executed in connection therewith, as amended, and secured by a security interest in some of Appellee's assets, excluding inventory and such items that relate exclusively to the purchase of inventory. Consistent with the terms of the loan agreement, the parties executed the Appellee security agreement (security agreement). Under the terms of the security agreement, Appellee agreed to grant to the Bank Group a perfected security interest in its assets excluding inventory. This perfected security interest included Appellee's accounts receivable, equipment, instruments (as defined by the Uniform Commercial Code), and general intangibles.

It is undisputed that the Bank Group's security interest in Appellee's accounts and general intangibles is duly perfected by the filing of mortgages, deeds of trust, collateral assignment of leases, financing statements, and other documents required by applicable non-bankruptcy law to perfect the security interest granted. However, the Bank Group has no perfected security interest in Appellee's instruments or proceeds of instruments since it does not have possession of Appellee's instruments or proceeds thereof as required by N.C.Gen.Stat. § 25–9–304.

The Bank Group currently holds in the suspense accounts proceeds from credit card transactions in the amount of One Million Eight Hundred Twenty-three Thousand One Hundred Forty-one and 93/100 Dollars ($1,823,141.93). The bankruptcy court found that the credit card slips were "instruments"

as defined by N.C.Gen.Stat. § 25–9–105(1)(i); therefore, the Bank Group does not have a perfected security interest because it does not have possession of the credit card slips.

## Issues

1. Whether the bankruptcy court erred in finding that the credit card slips generated by sales of the inventory of Brendle's Stores, Inc. are instruments.

2. Whether the bankruptcy court erred in denying the Bank Group's motion for relief from stay relating to credit card receivables.

## Analysis

■ Instruments are defined by N.C.Gen. Stat. § 25–9–105(1)(i) as "a negotiable instrument ... or security ... or any other writing that evidences a right to the payment of money and is of a type which is in the ordinary course of business transferred by delivery with any necessary endorsement or assignment." Sections 25–3–104(1)(d) and 25–3–110 of the North Carolina General Statutes make it clear that credit card slips are not negotiable instruments. Similarly, credit card accounts do not qualify as securities as defined by N.C.Gen.Stat. § 25–8–102(1)(a). Thus, if credit card slips are writings that evidence a right to the payment of money and are of the type that are, in the ordinary course of business, transferred by delivery, then they are instruments as defined by N.C.Gen.Stat. § 25–9–105(1)(i).

■ The Uniform Commercial Code (U.C.C.) was drafted to facilitate business transactions and to conform, where appropriate, to the prevailing commercial practices. Accordingly, the role of credit card slips must be assessed in the context of the entire credit card system. Article 9 classification should depend in large part on how professionals who deal with such writings handle them; therefore, the law should place importance on possession of a writing only if professionals who deal with the writings view them with similar importance. Stephen L. Sepinuck, *Classifying Credit Card Receivables Under the U.C.C.: Playing With Instruments?*, 32 Ariz.L.Rev. 789, 800 (1990).

## The Credit Card System

It is undisputed that the credit card system involves four primary parties including a customer, a merchant, a merchant bank, and a issuing bank. Pursuant to a contract, a credit card is issued to a customer by an issuing bank. In most transactions, the customer presents the credit card to a merchant. At the point of sale, the merchant uses the credit card to generate an embossed transaction slip with an issuing bank authorization code, and the customer receives some goods from the merchant. One copy of the transaction slip is given to the customer, one is retained by the merchant, and the original is either presented to the merchant bank or to a data processing company for other processing and/or storage. Information about the credit card sale is electronically reported by the merchant to the merchant bank, which processes for collection the credit card sale for a discounted payment, usually in the form of a credit/deposit to merchant's account. Merchant bank then reports the information about the sale to the issuing bank, which then pays the merchant bank. Finally, the issuing bank bills the customer and takes responsibility for collecting the amount due from the card holder.

## The Role of Credit Card Slips

Much of the confusion that exists concerning the classification of credit card receivables is a consequence of the receivables having some of the attributes of instruments. Specifically, while the right to payment on a credit card receivable may require presentment of the writing—at least when one exists—presentation of the writing will not alone be sufficient to entitle the holder to payment. To obtain payment, the holder must also have some contractual relationship with one or more members of the credit card system: member bank for Visa or MasterCard; American Express itself for Optima or the American Express Card. Without such a relationship, no one will honor a credit card slip presented for payment. Even when a writing does exist, bank card slips are not always transferred to the issuing bank; the merchant or the merchant bank may retain them and electronically transmit the information necessary to obtain payment and bill the cardholder. This truncation of the collection procedure suggests that the right to collect is not intrinsically bound to the writing. In short, presentation of the writings representing credit card receivables is sometimes required, but is insufficient to obtain payment, and transfer of such writings—by delivery or otherwise—is usually not permitted. Sepinuck, *supra*, at 803. The litigants in this case had a typical relationship with respect to the credit card system. When a credit card slip is created at Brendle's,

> [t]he customer keeps one copy of the transaction slip and Brendle's keeps the other copies....
>
> Each night Brendle's employees collect the transaction slips that were created that day. If the collected transaction slips match the totals on the store registers, then the next day the transactions slips are sent to Appalachian Computer Services ("ACS") for filing and storage. ACS also enters information about the credit card transaction into a data base.
>
> ....
>
> When transaction slips are received by ACS, they are reproduced on microfiche and are stored on microfiche for seven (7) years....

Supplemental Affidavit of Richard E. Dyer (5/20/93) (Bankr.Doc. No. 1F–396), ¶¶ 3, 4, and 7. Within Brendle's method of processing credit card slips, it is clear that the slips are not "transferred by delivery." The transfer of physical possession of the credit card slips to Appalachian Computer Services (ACS) does not transfer any right to the payment of money. Further, ACS acquires no rights in the credit card receivables because it is contractually precluded from doing so.

There is a contract between the customer and the issuing bank as well as a contract between the merchant and the issuing bank. These contracts govern the rights and responsibilities of the parties participating in the credit card system. The contractual provisions determine the procedures that a merchant must follow to consummate a credit card transaction and to receive payment. These contracts prohibit the merchant from

processing transaction slips of any other seller and give the merchant bank the sole right to receive payment for credit card sales information submitted to it for processing. These contractual provisions set the parameters in which all participating parties must operate. The contractual parameters, viewed in the context of the credit card system, make it clear that credit cards are not ordinarily transferred by delivery.

◼ In light of the prevailing commercial practices and the purpose of the U.C.C., there exist no compelling reason to classify credit card slips as instruments. They are non-transferable, they are not generally presented back to the issuer in the collection process, and creditors usually have no access to the clearinghouse procedure through which they are paid. It would serve no useful purpose to classify them as instruments, thereby requiring secured creditors to take possession of them in order to perfect their interest. Classifying credit card slips as instruments would frustrate prevailing commercial practices. The Permanent Editorial Board of the U.C.C. concurs with this conclusion. In a recent Permanent Editorial Board Study Group Report on Article 9, the Committee recommended:

> Article 9 should be revised to define "credit card receivables" as a new type of collateral, to provide that Article 9 covers sales of credit card receivables (as well as security interests therein that secure obligations), and to provide that filing a financing statement is the only means of perfecting a security interest in credit card receivables.

Permanent Editorial Board Study Group Report on Article 9, (1992). The practical effect of requiring possession to perfect an interest in credit card receivables would undermine the ability of creditors to perfect their security interests and would effectively prevent them from using credit card receivables as collateral. It would also necessitate that creditors and debtors continuously distinguish between credit card receivables created in point-of-sale transactions and those arising from telephone and mail orders, for which no writing exists.

After considering the arguments of counsel, this Court is of the opinion that the bankruptcy court erred in finding that the credit card slips generated by sales of the inventory of Brendle's Stores, Inc. are instruments. Therefore, the Bank Group's motion for relief from stay relating to credit card receivables is granted.